NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 231591-U

NO. 4-23-1591

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 23, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | No. 22JA41 |
| v. | ) | |
| Jessica M., | ) | Honorable |
| Respondent-Appellant). | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: Finding no issues of potential merit to support an appeal in this case, appellate counsel's motion to withdraw is granted and the trial court's judgment is affirmed.

¶ 2    Respondent Jessica M. is the mother of I.M. (born in 2022). In November 2023, the trial court adjudicated the minor to be neglected. In December 2023, the court found respondent unfit and placed guardianship and custody of the minor with the Illinois Department of Children and Family Services (DCFS). The identity of the minor's father is unknown.

¶ 3    Respondent appealed, and her appointed appellate counsel moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). In her supporting brief, appellate counsel contends that this appeal presents no potentially meritorious issues for review. Notice was given to respondent, and no written response was filed. We grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                  A. Neglect Petition

¶ 6            In July 2022, the State filed a petition for adjudication of wardship of I.M. The petition alleged that the minor was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) in that his environment was injurious to his welfare because respondent (1) gave birth to I.M. in Iowa to evade DCFS involvement, (2) was found dispositionally unfit as to her four older children, (3) is not allowed to visit her older children due to a no-contact order resulting from her behavior during supervised visits, and (4) gave false information as to her address and the name of I.M.'s father. Following a shelter care hearing, the trial court found probable cause to believe I.M. was neglected and granted temporary custody of the minor to DCFS.

¶ 7                                 B. Adjudicatory Hearing

¶ 8            In October 2022, the trial court held an adjudicatory hearing. The court took judicial notice of the case files in Knox County case Nos. 19-JA-35, 21-JA-37, 21-JA-38, and 21-JA-39, the four cases involving respondent's older children.

¶ 9            Brooke Matykiewicz, a DCFS caseworker, testified she was the caseworker in I.M.'s case and his older siblings' cases. Matykiewicz believed respondent gave birth to I.M. in Iowa to "escape DCFS." She did not know the identity of I.M.'s father. In the cases involving respondent's four older children, Matykiewicz stated respondent was found unfit and the permanency goal for those cases was "[s]ubstitute care pending court determination on termination of parental rights."

¶ 10           Matykiewicz described respondent's behavior at supervised visits with the older children as "[v]ery chaotic." She regularly heard respondent yelling, screaming, and cursing in

front of the older children. Eventually, a no-contact order was issued against respondent after she threatened the older children and the visitation specialist during a supervised visit in January 2022. Respondent has had no contact with the older children since this incident.

¶ 11        Matykiewicz stated her last in-person meeting with respondent occurred at a child and family team meeting at the end of June 2022 and her last contact with respondent was through a text message at the end of July 2022. Respondent initiated the child and family team meeting to assess the placement of I.M., with whom respondent was pregnant at the time.

¶ 12        Respondent testified on her own behalf. However, after she admitted to contracting COVID-19, the trial court ordered respondent to leave the courtroom. At the time, a sheriff's order prohibited any person with COVID-19 from entering the courthouse. The adjudicatory hearing was continued.

¶ 13        In October 2022, the adjudicatory hearing resumed. Respondent failed to appear, and the hearing was again continued. In November 2022, respondent's counsel filed a motion to withdraw due to a lack of communication with respondent and her failure to appear at multiple hearings. Following a December 2022 hearing, the trial court granted counsel's motion to withdraw. The court later appointed counsel to represent respondent.

¶ 14        The adjudicatory hearing resumed in November 2023. Respondent testified she began mental health treatment in 2019. She attended counseling twice a month and had monthly appointments with her psychiatrist. She testified to consistently taking psychiatric medication over this period.

¶ 15        Respondent next described the January 2022 visitation incident. According to respondent, two of the older children alleged abuse in their foster home. Respondent admitted she "reacted in an inappropriate fashion" but claimed she responded "[l]ike any protective mother

would." Following the incident, respondent stated she contacted Matykiewicz at least twice a week, but Matykiewicz refused to respond. Instead, respondent had to set up team meetings through Matykiewicz's supervisor.

¶ 16 Respondent completed two parenting programs, finishing the most recent one about a year before I.M.'s birth. She further completed a domestic violence program in 2018 or 2019 and a substance abuse evaluation. For her employment, respondent stated she worked as an independent nursing contractor and was working in a nursing home when I.M. was born. Respondent claimed she "temporarily" resided in Moline, Illinois, but she did not elaborate on the location of her current residence.

¶ 17 The trial court adjudicated I.M to be neglected based on anticipatory neglect. The matter was set for a dispositional hearing.

¶ 18                              C. Dispositional Hearing

¶ 19 In December 2023, the trial court held a dispositional hearing, at which respondent was not present. At the State's request, the court admitted into evidence a DCFS dispositional report, service plan, and Court Appointed Special Advocates report, all dated December 2023, and a parental capacity assessment dated January 2021.

¶ 20 According to the January 2021 parental capacity assessment, DCFS first became involved with respondent's family due to domestic violence between respondent and Eric S., the biological father of the four older children. The older children were removed from the home after the children sustained repeated physical injuries while in the care of respondent. In November 2017, a medical examination of two of the children revealed bruising and physical injuries consistent with physical abuse, and it was reported one of those minors ingested methamphetamine. After being returned to respondent's care in April 2019, one of the minors

sustained a black eye after respondent allegedly hit the minor in the eye for taking her phone. In September 2019, another one of the children was taken into DCFS custody after sustaining a skull fracture while in respondent's care.

¶ 21　　　　Nicolette Fox, a DCFS child welfare specialist, testified she was assigned to I.M.'s case in November 2022. Under the service plan, respondent was required to complete a parenting class, domestic violence services, a mental health assessment, and drug testing; she was also required to cooperate with DCFS and maintain stable housing and income.

¶ 22　　　　Respondent had not completed an integrated assessment in I.M.'s case. Although respondent completed two parenting classes in the older children's cases, she was required to take an additional parenting class "in light of her parenting capacity." Respondent also completed a domestic violence program in the older children's cases. However, because respondent had not provided her address, Fox stated there was no way to verify if respondent had any additional domestic violence incidents. For mental health services, respondent signed the releases and was currently attending therapy at Robert Young. However, Robert Young reported respondent discontinued her psychiatric medications in August 2022 "because she didn't feel like she needed them anymore."

¶ 23　　　　As for her cooperation with DCFS, Fox described respondent as "very inconsistent in contact." Fox noted respondent would sometimes answer texts and phone calls and set up meetings, but other times she would not hear from respondent for months. Specifically, after giving birth to I.M. in July 2022, respondent had no contact with DCFS until January 2023. Fox also indicated respondent still had not provided her current address. The last two physical addresses provided by respondent were either vacant lots or invalid addresses when searched on Google Maps. Respondent never provided any documentation of where she worked.

¶ 24   Fox testified respondent was also uncooperative with drug testing. Although respondent was required to complete drug testing twice a month, she provided a total of two negative drug tests over the course of a year. Respondent told Fox "she drug tests at work so she doesn't feel like she needs to at DCFS." Fox indicated she did not have access to any drug tests respondent may have completed through her employment.

¶ 25   Respondent has never had visitation with I.M. The first time respondent asked for visitation was in February 2023, seven months after the minor's birth. However, Fox explained that DCFS issued a no-visitation decision for I.M. due to (1) an existing no-visitation decision for the older siblings and (2) therapeutic and physician recommendations that respondent should not have visitation with I.M. Fox noted that, regardless, respondent was required to complete her drug tests as a prerequisite to starting visitation, and her failure to do so meant visitation was not a possibility.

¶ 26   The trial court found respondent unfit, made I.M. a ward of the court, and placed guardianship and custody with DCFS. The unfitness finding was based on two grounds: first, she failed to make reasonable progress or efforts to correct the conditions which led to the removal of the four older children; and second, she failed to demonstrate a reasonable degree of interest, concern, or responsibility as to the welfare of I.M. during the first 30 days after his birth.

¶ 27   This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29   Appellate counsel moves to withdraw, arguing this case presents no potentially meritorious issues for review. See *In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (holding *Anders* applies to parental rights cases). Counsel states in her motion that she has examined the record and found no issue of arguable merit. She lists two potential issues for review: (1) whether the trial

- 6 -

court erred in finding the minor was neglected and (2) whether the court erred in finding respondent was unfit and making the minor a ward of the court. Because we agree with counsel that any argument as to these potential issues would be frivolous, we grant the motion to withdraw and affirm the court's judgment.

¶ 30                                A. Adjudicatory Finding

¶ 31          Appellate counsel contends no potentially meritorious argument could be raised to challenge the trial court's order finding I.M. to be neglected.

¶ 32          Under the Juvenile Court Act, the trial court must follow a two-step process when deciding whether a minor should be made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. In the first step, the court conducts an adjudicatory hearing to determine whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2022); *In re Z.L.*, 2021 IL 126931, ¶ 59. Section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)) defines a neglected minor as any minor "whose environment is injurious to his or her welfare." While the term "injurious environment" is often characterized as an amorphous concept that cannot be defined with particularity, it has generally been recognized as including "the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *In re J.C.*, 2012 IL App (4th) 110861, ¶ 30.

¶ 33          "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). The burden is on the State to prove allegations of neglect by a preponderance of the evidence, *i.e.*, that the allegations are more probably true than not. *A.P.*, 2012 IL 113875, ¶ 17. On review, a trial court's finding of neglect will not be reversed unless it is

contrary to the manifest weight of the evidence. *Arthur H.*, 212 Ill. 2d at 464. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 34　　　　The allegations in the petition here were premised upon the theory of anticipatory neglect. Under this theory,

> "the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Id.* at 468.

However, "there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household." *Id.* Instead, the trial court must assess both "the circumstances surrounding the sibling" and "the care and condition of the child in question." (Internal quotation marks omitted.) *Id.* "[W]here the child is alleged to be neglected under the theory of anticipatory neglect, *** the court needs to evaluate the individual with whom the child will reside." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 34.

¶ 35　　　　In this case, the record adequately supports a finding of anticipatory neglect of I.M. Between 2017 and 2019, respondent's older children were taken into protective custody on three separate occasions after sustaining physical injuries while in her care. Even after the older children were removed and custody was granted to DCFS, respondent's behavior around the children showed no improvement. Her supervised visits at the DCFS office were described as "[v]ery chaotic," and she could be heard yelling, screaming, and cursing while in the presence of her children. Most disturbingly, evidence was presented that respondent directed threats towards the older children and a visitation specialist during a January 2022 supervised visit. This incident occurred mere months before respondent gave birth to I.M.

¶ 36   Respondent's evasive and uncooperative behavior continued after I.M.'s birth. She did not report I.M.'s birth to DCFS, despite being told to do so by her caseworker. Matykiewicz found out about the birth only after calling four or five hospitals. Respondent named multiple individuals as I.M.'s father, two of whom were DNA tested and eliminated. The identity of the father remains unknown. Respondent also refused to provide her residential address to DCFS or the trial court.

¶ 37   At the time of the adjudicatory hearing, respondent remained dispositionally unfit in the older children's cases and had not progressed toward their return. The goal for the older children's cases was substitute care pending termination of parental rights, and visitation had not been restored due to the no-contact order against respondent. On this record, the State sufficiently proved anticipatory neglect of I.M. by a preponderance of the evidence. Accordingly, we agree with appellate counsel that there is no potentially meritorious argument to be made that the trial court's finding of neglect was against the manifest weight of the evidence.

¶ 38                    B. Dispositional Findings

¶ 39   Appellate counsel determined no potentially meritorious argument could be made to warrant reversal of the trial court's order finding respondent unfit and making the minor a ward of the court.

¶ 40   Following an adjudication of neglect, "the trial court then moves to step two, which is the dispositional hearing." *A.P.*, 2012 IL 113875, ¶ 21. At the dispositional hearing, the court determines "whether it is in the best interests of the minor and the public that the minor be made a ward of the court." 705 ILCS 405/2-22(1) (West 2022). If the minor's parents are found to be unfit, unable, or unwilling to care for the minor, the court may properly place guardianship and custody of the minor with DCFS. *Id.* § 2-27(1)(d). A court's dispositional findings will be reversed "only

if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order." (Internal quotation marks omitted.) *In re K.B.*, 2012 IL App (3d) 110655, ¶ 23.

¶ 41 In this case, respondent failed to demonstrate any meaningful effort in completing the requirements under the service plan. While she completed two parenting classes, a domestic violence program, and attended therapy, she almost totally failed to comply with drug testing and discontinued taking her psychiatric medication. Moreover, her lack of cooperation with DCFS persisted throughout the case. It took respondent seven months after DCFS took protective custody of I.M. to even request visitation with the minor, which was never granted, due in part to her failure to comply with drug testing. At the time of the dispositional hearing, respondent had yet to provide valid proof of her residence or her employment. On this record, we agree with appellate counsel that no potentially meritorious arguments can be raised on appeal that the trial court's dispositional findings were against the manifest weight of the evidence.

¶ 42                                    III. CONCLUSION

¶ 43 For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 44 Affirmed.